1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                     GALVESTON DIVISION

4  K INVESTMENTS, INC., ET AL    §    CASE NO. 3:21-cv-00016
                                 §    GALVESTON, TEXAS
5  VERSUS                        §    THURSDAY,
                                 §    APRIL 15, 2021
6  B-GAS LIMITED AKA BEPALO      §
   LPG SHIPPING LTD., ET AL      §    10:50 A.M. TO 1:42 P.M.
7

8                 EVIDENTIARY HEARING (VIA ZOOM)

9          BEFORE THE HONORABLE ANDREW M. EDISON
                UNITED STATES MAGISTRATE JUDGE
10

11

12     APPEARANCES:              SEE NEXT PAGE

13     COURT RECORDERS:          CYNTHIA BENAVIDES
                                 LORRAINE TREVINO
14

15     (Audio distorted.)

16

17

18

19

20             TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 ELDRIDGE ROAD, #144
22              SUGAR LAND, TEXAS 77478
           Tel: 281-277-5325 / Fax: 281-277-0946
23            www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

1                    <u>APPEARANCES (VIA ZOOM)</u>:

2

3  FOR THE PLAINTIFF:          GAITAS & CHALOS, PC
                               Attorney George A. Gaitas
4                              Attorney Jonathan M. Chalos
                               1908 N. Memorial Way
5                              Houston, TX  77007
                               (281) 501-1800
6

7

8  FOR THE DEFENDANT:          BLANK ROME LLP
                               Attorney Keith B. Letourneau
9                              717 Texas Avenue
                               Suite 1400
10                             Houston, TX  77002
                               (713) 228-6601
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2

3   WITNESS:          Direct     Cross    Redirect    Recross   VOIR DIRE

4   CHRISTIAN KROHN-HANSEN
     By Mr. Gaitas      10, 24     .         54         .         .
5    By Mr. Letourneau    .        42         .         56        22

6

7
    EXHIBITS:                    Marked    Offered    Received
8
    (None offered.)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CORPUS CHRISTI, TEXAS; THURS., APRIL 15, 2021; 10:50 A.M.

2        THE COURT: Let me call Case 3:21-CV-16,

3   K Investments, Inc. versus B-Gas Limited.

4        MR. GAITAS:  George Gaitas, Your Honor, with my

5   learned partner, a Mr. Johnathan Chalos, for the Plaintiffs.

6        THE COURT:  All right, gentleman, good to see you.

7        MR. CHALOS:  Good morning, Your Honor.

8        THE COURT:  For the Defendants.

9        Mr. Letourneau, I guess you're on mute.

10        MR. LETOURNEAU:  My apologies, Your Honor.  Your

11   Honor, on behalf of Bergshav Shipping AS, in their

12   restricted capacity, and Keith Letourneau, Zachary Cain, and

13   Burt Jeffs AS North Region counsel Bombay.

14        THE COURT:  Good to see all of you.  Let me tell

15   you one thing upfront, I can hear you, Mr. Letourneau, but

16   it's a little faint.  Obviously, before we get into it,

17   we'll see if you can get that --

18        MR. LETOURNEAU:  Would you like me to call back,

19   Your Honor?

20        THE COURT:  Well, I'm -- to the extent there's any

21   problems hearing you or anything, I'll make sure I stop you.

22        MR. LETOURNEAU:  Okay.

23        THE COURT:  I'm the last person to ask about how

24   to solve technical -- technological issues.

25        MR. LETOURNEAU:  My speakers are at 100 percent

1  right now, so.

2           THE COURT:  So, put it up to 11.

3           MR. LETOURNEAU:  Can't go any higher.

4           THE COURT:  Can't go any --  put it on

5  110 percent.

6           MR. LETOURNEAU:  I could --

7           THE COURT:  (Indiscernible) -- No worries.

8           Okay.  First thing, before we get obviously to the

9  attachment issue, I guess let's just -- are there any issues

10 with the case scheduling?

11          MR. LETOURNEAU:  Your Honor, from the Defendants'

12 perspective, we would prefer not to have a Docket Control

13 Order entered until the Motion to Vacate is decided, we

14 don't want to be engage in discovery discussions.

15          THE COURT:  Okay.

16          MR. LETOURNEAU:  Did you hear me?

17          THE COURT:  Yeah, yeah.  I'm just trying to think

18 through this.

19          Okay.  And on the Plaintiffs' side?

20          MR. CHALOS:  Your Honor, we would -- we don't have

21 any issue with the Docket Control Order, or it being

22 entered.  And as far as discovery goes, if -- if the Court

23 is so inclined that they would like to order limited

24 discovery just on any jurisdictional issues, that would be

25 something that we would request, you know, as well.

1          THE COURT:  Well, what -- let me try to

2    understand.  So, Mr. Letourneau, you know, obviously you're

3    going to have to -- we're going to have -- the Motion to

4    Vacate hearing is set.  If I vacate, I'm just judging how

5    this works going forward.  So, if I vacate it, we still need

6    to schedule to handle the case, right?  What am I missing?

7          MR. LETOURNEAU:  Certainly, Your Honor, we need a

8    schedule to handle the case.  We have no problem with the --

9    the trial setting, those dates, but we don't want to engage

10   in any discovery unnecessarily.  So, in other words, we

11   would prefer that any -- the commencement of discovery would

12   await the decision on the Motion to Vacate.

13         THE COURT:  Okay.  I hear -- I get the -- and

14   obviously, I hope to kind of issue in one way or the other

15   as quickly as possible, but what is -- now, it's clearly

16   missing something, but why does it matter, right?  So, if I

17   say we're going to grant it or deny it, the case is going to

18   proceed, right?

19         MR. LETOURNEAU:  Right, Your Honor.  If you grant

20   the Motion to Vacate, that they end, I mean, if it would go

21   to that grounds beyond any objections that the Plaintiff

22   would file.  But the case ends at that point in time, and so

23   we wouldn't have to engage in this discovery.  If you deny

24   the Motion to Vacate, then we go through the discovery

25   process.

1          THE COURT:  I suppose the only question is whether

2   the attachments --

3          MR. LETOURNEAU:  Is valid.  It's valid if it's --

4   the fact that it's not valid, there is no jurisdiction, and

5   so the case ends.

6          THE COURT:  Okay.

7          MR. LETOURNEAU:  We call -- we call that -- Your

8   Honor, that the vessel was attached under Supplemental

9   Rule B, which means that that basically creates the basis

10  for jurisdiction.  Plus, if the security was posted for the

11  vessel, the vessel is long gone, but there still has to be

12  security.

13         THE COURT:  Right.

14         MR. LETOURNEAU:  And so, if you order vacation of

15  the attachment, there is no longer substitute security and

16  therefore no basis with jurisdiction.

17         THE COURT:  Okay.  So, I guess -- I guess I just

18  pull the Docket Control Order and then if it's vacated,

19  there's no reason to have Docket Control Order.  And if it's

20  not vacated since it's -- since the Docket Control Order is

21  what?

22         MR. LETOURNEAU:  Correct.  My respect.

23         THE COURT:  And I guess my only question really is

24  with respect to the dates that are on there, if any.  I

25  mean, and I totally understand that -- obviously, that

1  vacating the attachment if you could, but if -- if it's not

2  a -- if it's not vacated, any issue with vacate?

3          MR. LETOURNEAU:  No issue on that premise, Your

4  Honor.

5          THE COURT:  Okay.  Let's do this:  Let me -- I

6  want to, I don't know how to say it, but I need a bathroom

7  break.  So, let's give me five minutes, and then we'll go --

8  we'll get back, and I know -- so I know that -- before we do

9  that.  I guess, let me just ask so how do you all view the

10 hearing going forward, meaning I know the Plaintiffs

11 indicated they're going to call a witness.  I know I've

12 gotten the exhibits.  The Defendant has indicated they're

13 going to cross-examine.  Are there any other witnesses you

14 intend to call?  And I'm -- and I've read everything.  I've

15 got -- I've read all the affidavits and looked at all the

16 cases, but anything else on, you know?

17         My view was let's call the witnesses, whatever

18 side call the witnesses and then have arguments, but I'm

19 open to your thoughts on it.

20         MR. LETOURNEAU:  Your preference, Your Honor.

21 We're not going to be calling any other witness.

22         THE COURT:  Okay.  Give me five minutes.  Let's

23 bathroom break.  Off the Record.  Thank you.

24     (Recess taken from 10:57 a.m. to 11:03 a.m.)

25                     AFTER RECESS

1        THE COURT:  We are back on the Record.  And I

2   guess before we start, I think it would be helpful and this

3   may seem like a dumb question, but help let me get a little

4   context here today, so I fully understand.  From reading the

5   documents, there's an arbitration proceeding going on

6   somewhere, correct?

7        MR. GAITAS:  Yes, Your Honor.  And there's an

8   arbitration proceedings on the merits in England.

9        THE COURT:  Okay.  So, the only question here is

10  whether or not the maritime attachment is proffered or not.

11  And obviously, I understand that the vessel is no longer

12  here, but basically cash has been put up in lieu of the

13  vessel.  Is the ultimate alter ego issue going to be have to

14  be decided in that English arbitration one way or the other?

15       MR. LETOURNEAU:  No, Your Honor.  That was the

16  decision for the Court to make.  So, in other words, if

17  you -- if you deny the Motion to Vacate, then we would

18  engage in discovery on the alter ego issue of throughout and

19  ultimately the Court will have to make a decision as to

20  whether or not the alter ego has been pierced or not.

21       THE COURT:  Okay.

22       MR. GAITAS:  That's correct.  We adhere to that.

23       THE COURT:  Okay.  So I just want to make sure I'm

24  on -- I wasn't missing something.  Okay.

25            Plaintiffs want to call their first witness?

1          MR. GAITAS:  Yes, Your Honor.  We will call

2    Mr. Christian Krohn-Hansen.

3          THE COURT:  Well, personally I know how to spell

4    Christian Krohn-Hansen because he's been very kind and put

5    it there.  For the Record, it's C-H-R-I-S-T-I-A-N, Krohn,

6    K-R-O-H-N, and Hansen, H-A-N-S-E-N.

7          And Mr. Hansen, could you please raise your right

8    hand, sir?

9          Do you swear the testimony you're going to give in

10   this court proceeding is the truth, the whole truth, and

11   nothing but the truth, so help you God.

12          THE WITNESS:  I do.

13          THE COURT:  Please proceed, sir.

14       DIRECT EXAMINATION OF CHRISTIAN KROHN-HANSEN

15   BY MR. GAITAS:

16   Q    Mr. Krohn-Hansen, you have filed a Declaration in these

17   proceedings and in these documents that 21-1 was the number

18   of exhibits, and I would like to ask you if you stand by

19   these documents as a truthful Declaration.

20   A    I do.

21   Q    And before we proceed with your examination, I would

22   like to ask you if there are any corrections that you would

23   like to make to that Declaration?

24   A    There are a couple of corrections I would like to make.

25   And the first one is in Exhibit S, where boats having

1  attached owns actually 70 percent of the AS -- B-G Invest,

2  the Gas instead of 51.  The change comes from an additional

3  capital injection.

4          THE COURT:  All right.  Hold on a second.  I want

5  to make sure I understand.  So, are we looking at a

6  particular paragraph of the Declaration, Exhibit 21-1, that

7  you are asking to revise or clarify, or specifically, am I

8  just looking at Exhibit S to your Declaration?

9          THE WITNESS:  Exhibit S.  It's page 236.

10          THE COURT:  I have it.

11          THE WITNESS:  There's a table there.  Line 2, 3,

12  and 4 on the control part.  Bergshav Invests owns 70 percent

13  of the LPG Invest AS, not 51 percent as its stated here.

14  There was an additional capital investment injection in the

15  company; therefore, this has increased.

16  BY MR. GAITAS:

17  Q     Okay.  Any other corrections?

18  A     A very minor one.  In paragraph 6 where it says, the

19  broker is based in Burgeon.  It's partially true because the

20  headquarters of the broker is in Burgeon, but actually, the

21  broker was (indiscernible).  This is paragraph 6.

22          And then paragraph 18, it says that we first learned

23  about the request for direction to hire end of May 2020

24  while we're actually got a meeting now on the 30th of April

25  which was from the broker but with a quoted message from the

1   CEO for Bergshav -- sorry, CEO of B-Gas, where it was

2   mentioned about the reduction in, you know, hiring these

3   ships.

4        These are the three amendments I'd like to make.

5   Q    Okay.  When you received the message of April -- at

6   April 2020 from -- through broker I understand, and I'm

7   (indiscernible) the document about if there (indiscernible).

8   Did you at the time know that the company, B-Gas AS, has

9   changed hands and it was owned by parties unknown to you?

10  A    No.  We didn't know.

11  Q    Have you verified the Complaint and the Amended

12  Complaint to this action?

13  A    I have, yes.

14  Q    And are the contents of these Complaints true and

15  correct?

16  A    They are, yes.

17  Q    Now, if you go in your Declaration and you look at

18  paragraphs 20 and 25 --

19  A    Yes.

20  Q    -- in there you discuss how a number of vessels that

21  were owned by B-Gas Limited were transferred, they changed

22  ownership, and these were the B-GAS CRUSADER, B-GAS

23  COMMANDER, B-GAS CHAMPION, and B-GAS MAUD?

24  A    Sure.

25  Q    Once you received the requests on the April and then

1  May for the reduction to hire, were you told?  Did you have

2  any way of knowing if these ships had changed ownership?

3  A    No.  No.

4  Q    Did you Mr. McPhail (phonetic) or Mr. Hanavich

5  (phonetic) tell you that these ships can be transferred to

6  other owners?

7  A    No, they did not.

8  Q    Based on your Declaration and the Declaration of

9  Mr. Hanavich that you have read, when these ships were being

10  transferred and do you know when they were transferred

11  finally?

12  A    From our investigations foregoing, the repudiation of

13  the whole (indiscernible) departments, the transfers, I

14  believe, were done around June of 2020.

15  Q    Around June 2020, did anyone from the charter, B-Gas

16  Limited, inform you that they had transferred the ships?

17  A    No one.

18  Q    In the months that followed June, did anyone from the

19  charter, B-Gas Limited, inform you that the ownership had

20  changed?

21  A    No.  We only learned after a long investigation

22  following the repudiation of the -- of the (indiscernible).

23  Q    In looking at paragraph 27 of your Declaration, when

24  you start to transfer by Bergshav Shipping Limited of its

25  entire interest in B-Gas Limited in June 2020, did B-Gas

1  Limited inform you that these sales, change of ownership,

2  had taken place?

3  A    No.  Never.

4  Q    Did Bergshav -- did Mr. McPhail inform you?

5  A    No, he didn't.  No.

6  Q    And for the Record, who is Mr. McPhail?

7  A    McPhail is the current CEO of B-Gas, who took over in

8  around February 2020.

9  Q    And when you say "B-Gas," is that B-Gas Limited or?

10  A    B-Gas as in B-Gas AS, which is back in Copenhagen,

11  which is also where McPhail is based.

12  Q    And so that we are all in context, the CEO, the one

13  we're talking about, what is -- what is the role of B-Gas AS

14  in Copenhagen; what's the work they do?

15  A    B-Gas AS is the commercial monitor and operator of the

16  B-Gas fleet.  They do all of the chartering, all of the

17  operation, et cetera.

18  Q    Did any of the officers or thereafter, the B-Gas

19  Limited, inform you of these changes in who is July, August,

20  September of 2020?

21  A    It was never informed to us, no.

22  Q    At that time did you have any reason to believe that

23  B-Gas Limited had transferred the vessels to

24  (indiscernible), the core vessel and the ownership of B-Gas

25  AS?

CHRISTIAN KROHN-HANSEN - DIRECT BY MR. GAITAS                 15

1   A     No, we did not.

2   Q     You work for the Plaintiffs as an in-house broker,

3   correct?

4   A     Correct.

5   Q     To utilize a broker that the change in the ownership of

6   these assets of the charter make any difference, does it

7   have any significance, and if so, what is it?

8   A     Makes a big difference for us.  The security of our

9   charter (indiscernible) is significantly changed.  And in

10  addition, if you go to the -- the charter part of it itself,

11  which is Exhibit X.

12        MR. GAITAS:  For the Record, the identical

13  document for all vessels, Your Honor, and it is -- it is

14  beginning in the document 17-2 actually in the Amended

15  Complaint, and it begins at the text -- the text of the

16  charter party begins on page 3 of 21.

17  BY MR. GAITAS:

18  Q     Mr. Krohn-Hansen --

19        THE COURT:  Well, hold on.  Hold on one second --

20  one second.

21        Modern technology.  My computer just froze.

22        Okay.  Go ahead.  I'm sorry.

23  BY MR. GAITAS:

24  Q     If you go to page 18 of Exhibit X, which is Clause 39

25  of the (indiscernible) --

1          THE COURT:  Well, hold on.  I want to make sure,

2   we're looking at document 17 dash --

3          MR. CHALOS:  2.

4          THE COURT:  2

5          MR. CHALOS:  So, it's Exhibit 1 --

6          THE COURT:  Gotcha.  Page?

7          MR. GAITAS:  18.

8          THE COURT:  Proceed.

9   BY MR. GAITAS:

10  Q    Plus 39.B.  This goes -- refers to charter's covenants.

11  And it basically states an obligation to notify owners in

12  writing on any termination event.

13       If you go to Clause 41, which is two pages later,

14  page 20, it specifies termination events.  And one of the

15  termination events, which is specified is, If charter

16  dispose of a material party -- parts of their assets and

17  such confusion prevents the charter from making their

18  obligations under this charter.

19       So, from our perspective, this was clearly an

20  obligation, this was a termination event, and obligation by

21  the charters to notify us of the oath.

22  Q    And Mr. Krohn-Hansen, so that the Court will be clear

23  on what you refer to which is (indiscernible) in paragraph G

24  at document 17.2, which is at page 20?

25  A    Yes.  Correct.

1   Q     From what you have learned now, not what you knew at

2   the time when the changes were taking place, the changes

3   with the ownership of the assets in B-Gas Limited, who knew

4   that these changes had taken please on the charter side?

5   A     Mr. Hanavich was the keeper of some -- he

6   (indiscernible) knew.  We have his binder somewhere.  I

7   don't know, his Declaration.  He was --

8         Remind me the number of the exhibit.

9   Q     Yes.  It is that -- it is Exhibit -- it's Exhibit C,

10  Exhibit (indiscernible).  No.  It's Exhibit C in -- this

11  last one was number -- it's this one that responds to I,

12  that's why I couldn't find it.  It is some -- from the

13  Motion to Vacate the attachment.  It is document 53, and

14  Mr. Hanavich's Declaration is at pages 2 through 5, and with

15  another exhibit attached.

16  A     And Mr. Hanavich was present at all the board meetings

17  of B-Gas Limited, B-Gas Shipping -- no, I'm sorry, Bergshav

18  Shipping Limited, et cetera, and he have full knowledge of

19  what was happening.  Clearly he should have known.

20  Q     Mr. Krohn-Hansen, I'll point you to paragraphs 10 and

21  11 in the Declaration of the (indiscernible).  If you look

22  at it, and it's at page 4 of this document, and tell the

23  Court where Mr. Hanavich mentions these transfers and the

24  time they took place.

25  A     I'm sorry.  Where he mentions the transfers?

1  Q    Where he mentions the transfers of the four vessels,

2  the B-GAS MAUD in paragraph --

3  A    Well, he mentions the B-GAS MAUD in the paragraph 10,

4  and he mentions the three other ships, biggest (inaudible)

5  and biggest CRUSADER and biggest COMMANDER in paragraph 11.

6  Q    Yes.

7       And the times these transfers took place, does he note

8  that?

9  A    Spring of 2020.  I cannot see the specific timing here.

10 Q    All right.

11 A    (Indiscernible.)

12 Q    All right.  Now, who else should know if the property

13 was sold, apart from Mr. Hanavich?  He doesn't even know.

14          MR. LETOURNEAU:  Objection, speculation.

15 BY MR. GAITAS:

16 Q    Did you hear?

17          THE COURT:  Hold on.  I'm going to sustain the

18 objection.  I'll let you rephrase the question.

19 BY MR. GAITAS:

20 Q    Okay.  Mr. Krohn-Hansen, if B-Gas Limited had sold

21 these vessels like you've testified in June of 2020, --

22 A    Yes.

23 Q    -- would the person who's in charge of that know about

24 it, that they sold their assets?

25 A    The persons in charge and the directors of the company

1  would have known.  The board of directors, of course.

2  Mr. Atle Bergshav was chairman for basically all the

3  companies involved here.  And he's the chairman of B-Gas

4  Limited, B-Gas - I'm sorry -- Bergshav Shipping Limited,

5  Bergshav Holdings, B-Gas -- Bergshav Invest, so he was not

6  aware of what was going on.

7  Q    Now, I have no effort (indiscernible) and the chairman,

8  now I'd like to discuss, briefly pick up with you certain

9  documents that were -- that were made exhibits of your

10 Declarations, that the -- were originate from the corporate

11 filing records in Norway.

12 A    Yes.

13 Q    And I'd like -- I'd like to ask you if you speak

14 Norwegian.

15 A    I do speak Norwegian, yes.

16 Q    And you received part of your education in Norway?

17 A    I did, yes.

18 Q    And your college education?

19 A    Yes.  I did part of my college education there.

20 Q    So are you acquainted with the basic concepts of

21 business entities that are you used to conduct business in

22 Norway?

23 A    I am.

24 Q    And you know what -- what the word AS after the name of

25 the company stand for?

CHRISTIAN KROHN-HANSEN - DIRECT BY MR. GAITAS                    20

1  A    It stands for Aksje Selskap, which means there if you

2  translate it, stock company.

3  Q    It's like a corporation?

4  A    Just like a corporation, yes.

5  Q    When you prepared your Declaration, you had occasion to

6  refer to the annual report of Bergshav Shipholding AS --

7  A    Yes.

8  Q    -- in 2019?

9  A    Yes.  (Indiscernible.)

10  Q    And these are a copy or these are attached to your

11  Declaration as Exhibit T?

12  A    Yes, there is.

13  Q    And is the text that you looked at in English or

14  Norwegian?

15  A    A little bit of both.

16  Q    Now, focusing on the Declaration at paragraph 40,

17  approximately in the middle of the paragraph, do you see

18  that?

19  A    Yes.

20  Q    And what -- where you quote the Bergshav Shipholding

21  Group seeks to (indiscernible) value by making group

22  purchases and sales?

23  A    Yes.

24  Q    And did you read the same text also in Norwegian?

25  A    I did, yes.

 1  Q     And in Norwegian, would you read how that -- that

 2  sentence begins?

 3  A     (Answer given in Norwegian Language.)

 4  Q     What is the konsern mean?  What does the word konsern

 5  mean?

 6  A     Concern is -- basically means the unification of

 7  independent companies into one financial unit where the

 8  ultimate goal is to maximize the result of another company

 9  in order to -- for delta company or companies to be included

10  in a konsern, the mother company must own more than

11  50 percent of the shares or must control more than half of

12  what it's worth.

13          MR. LETOURNEAU:  Objection, Your Honor, move to

14  strike.  There's no way that that language said all that.

15          THE COURT:  Hold on, hold on.  I'm going to

16  sustain the objection and I'll let counsel rephrase the

17  question or re-ask the question and make sure we have more

18  narrowed response.

19          MR. GAITAS:  Yes, sir.

20  BY MR. GAITAS:

21  Q     Mr. Krohn-Hansen, konsern that means a corporation

22  standing alone, that's all?

23          MR. LETOURNEAU:  Objection, Your Honor; leading.

24          THE COURT:  Overruled.

25          THE WITNESS:  No, it doesn't a corporation

1  standing alone.  There has to be two or more companies in a

2  konsern; otherwise, it's not a konsern.

3  BY MR. GAITAS:

4  Q    And a konsern -- as you stated before, does that

5  include the mother company, one of the companies, has a

6  percentage of the shares of the other company?

7         MR. LETOURNEAU:  Objection, Your Honor;

8  foundation.  There's no evidence that this witness qualifies

9  to testify about this.

10         THE COURT:  I'll give you the opportunity, if you

11  want to take this witness on voir dire?

12         MR. LETOURNEAU:  Yes, Your Honor.

13         THE COURT:  Okay.  Go ahead, sir.

14      VOIR DIRE EXAMINATION OF CHRISTIAN KROHN-HANSEN

15  BY MR. LETOURNEAU:

16  Q    So, Mr. Kohn-Hansen, you are a broker for

17  (indiscernible) Hansen; is that correct?

18  A    (Indiscernible), yes.

19  Q    How long have you served in that capacity?

20  A    I've served in this capacity for 15 years.

21  Q    And you are not a lawyer, correct?

22  A    I'm not a lawyer, no.

23  Q    And you have never served in the capacity as an

24  individual that supplies (indiscernible) guidance on

25  corporate konserns, correct?

1    A    I am no, no.

2    Q    Okay.  And in your capacity as a maritime broker, have

3    you ever rendered any opinions concerning a meaning of the

4    term "konsern" in the Norwegian law?

5    A    I have not for this date, no.

6    Q    So in what other capacities have worked other than a

7    United States broker?

8    A    I have -- sorry, where have I worked or what have I --

9    Q    No.  The function of your job, have you always been a

10   maritime broker?

11   A    After finishing my economy and financial studies, I

12   have been a broker.  I am not a broker now.  I'm a manager,

13   but yes, I have worked in shipping, while continuing my

14   studies.

15   Q    And the duration?  How long (indiscernible) you expect?

16   A    I completed my studies.  I completed my studies 17-1/2

17   years ago.

18   Q    Okay.  So in essence, during that entire period, you

19   basically served as either a broker or a (indiscernible),

20   correct?

21   A    I did, correct.  I worked concerning Norway.

22   Q    Okay.  And what konsern was that?

23   A    Oilfield, chemical plants.

24   Q    And so in your experience was limited to your work for

25   (indiscernible) as a konsern; is that correct?

1  A     Sorry?

2  Q     You never worked for (indiscernible) in terms of

3  working for a konsern, that was the konsern that you worked

4  for, and is the extent of your experience in terms of a

5  konsern, correct?

6  A     Apart from my studies, yes.  I studies in finals for

7  five years.

8  Q     Okay.  And in your studies, did you address the issue

9  of what constitutes a konsern?

10 A     This is part of the studies, yes.

11 Q     And have you, in the course of your experience, ever

12 been engaged in any professional work rendering opinions

13 concerning what constitutes a konsern under Norwegian law?

14 A     Professionally, no.

15        MR. LETOURNEAU:  Okay.  So Your Honor, on that

16 basis, I would move to strike any responses where Plaintiffs

17 were concerned (indiscernible) work konserns and he may have

18 studied about it in school, but he's never engaged in any

19 professional capacity of what constitutes a konsern.

20        THE COURT:  I'll let Mr. Gaitas rephrase any

21 questions and we'll sort of go from there, based on the voir

22 dire that I just heard, so.

23        Mr. Gaitas, your witness.

24        MR. GAITAS:  Thank you, Your Honor.

25   DIRECT EXAMINATION OF CHRISTIAN KROHN-HANSEN (RESUMED)

1  BY MR. GAITAS:

2  Q    Mr. Krohn-Hansen, I'll refer you to your Declaration at

3  paragraph 3.  When you refer to your education, sir?

4  A    Yes.

5  Q    You have a natural science degree in shipping, trade

6  and financial from the University of London, correct?

7  A    Correct.

8  Q    And you have the undergraduate degree in business and

9  finance from the University in Glasgow, Scotland and from VI

10  Norwegian Business School in Burgøynes, Norway?

11  A    Correct.

12  Q    In your education in Norway, did you learn about the

13  different types of corporate entities and the nations of

14  corporate entities that are available for carrying on

15  business in Norway?

16  A    That was part of the studies, yes.

17  Q    And in your current position and your previous

18  positions as a chartering manager, do you have occasion to

19  evaluate on behalf of your employer what kind of entity it

20  is that you're doing business with?

21  A    Yes.  I do.

22  Q    And when you lead an exchange of email where somebody

23  proposes to do a fixture?

24  A    Yes.

25  Q    Do you -- you do your --

1        THE COURT:  Hold on a second.

2        I think Mr. Gaitas is frozen.

3        MR. LETOURNEAU:  It appears so, Your Honor.

4        THE COURT:  Hold on, Mr. Gaitas.  I apologize.

5   You froze there for a second.  I couldn't tell if it was the

6   technology or you were just giving me or the witness an odd

7   look, and I think it was the technology.

8        So if you would just rephrase the question, start

9   over with it.

10        MR. GAITAS:  Can you hear me now?

11        THE COURT:  Now you're good.

12        MR. GAITAS:  Okay.  I left off where -- I don't

13   know where you lost me, Your Honor.

14        THE COURT:  I would start with the whole question.

15   You started talking about this paragraph and you were

16   talking about his experience, so let's sort of go back

17   there.

18        MR. GAITAS:  I think I should be --

19        THE COURT:  There you go again, Mr. Gaitas, I

20   apologize.

21        MR. GAITAS:  Am I on now?

22        THE COURT:  Now you are.

23        MR. GAITAS:  Again, I'll talk faster, Your Honor.

24     (Laughter.)

25        THE COURT:  The only good thing is, I can see from

1  looking at Mr. Hansen and Mr. Letourneau and Mr. Chalos,

2  that it's not my technology, so that that makes me help.

3          Let's try it again and obviously we'll -- you

4  know, this is sort of one of those technological things that

5  happens.  I'm patient and understanding of all.

6          So you just started talking about your few

7  questions into -- after asking Mr. Hansen about paragraph 3

8  from this Declaration and giving his experience.

9  BY MR. GAITAS:

10 Q    Yes, and I respectively referred to Mr. Hansen to his

11 education in Norway and asked him whether he can learn in

12 the course of his studies about business institutions and

13 entities in Norway, if the curriculum included that.

14 A    Business studies, yes.

15 Q    And in the course of your work when you use your

16 in-house broker work, you correspond with the other trading

17 parties in Norwegian or in English, or which?

18 A    Both.  We do quite a bit of business with Norwegian

19 brokers, but yes, it's both English and Norwegian.

20 Q    So when one of the brokers you're doing business with,

21 you ask for a description of the company, but it's proposing

22 a charter relationship, do you see the word "konsern?"

23 A    Surely the (indiscernible), yes.

24 Q    And does it have a meaning that you understand when you

25 see that word?

1   A     Yes.  I know what it means.

2   Q     And is that meaning in English, much like the meaning

3   of a parent company and subsidiary?

4   A     Yes.  It is.

5   Q     And in this instance, this is what -- when you look at

6   the Norwegian text and you saw the word "konsern," it meant

7   that to you also?

8   A     Yes.  It did.

9   Q     And in looking at these documents, Mr. Krohn-Hansen,

10  the corporate documents are filed, but they identify other

11  companies that work as part of this konsern, and I would

12  refer you to page -- do you see a page 258?

13  A     Which page did you say?

14  Q     258, where it says to you, the company from that

15  sitting operation through the sub-groups Bergshav

16  Shipping AS, Bergshav Invest AS, and Bergshav Shipping

17  Limited.  In addition, asset management activities are

18  conducted through Bergshav Capital AS.

19  A     Yes.

20  Q     So when you look at the Bergshav Shipping Holding AS

21  corporate annual report of 2019, did this indicate to you

22  that there was a relationship of all of these companies from

23  what was said in that report, other than just a collection

24  of companies?

25  A     Yes.  It indicates that all this for shipping and all

 1  this for companies refer to the same group of which is

 2  Norwegians co-konsern.

 3  Q    In looking at the same document, Exhibit C, are they --

 4  is there any indication from that that these companies that

 5  are identified as a konsern together, have any relationship

 6  of these companies identified?

 7           MR. LETOURNEAU:  Object to form.

 8           THE COURT:  Say that again, Mr. Letourneau?

 9           MR. LETOURNEAU:  Say it again.  I didn't

10  understand the question.

11           THE COURT:  Rephrase it, sir.

12  BY MR. GAITAS:

13  Q    Mr. Krohn-Hansen, from reading the annual report, and I

14  focus your attention and to be specific at ECF 247 and

15  especially where there is a word there in Norwegian,

16  (Norwegian pronunciation), do you see that?

17  A    Yes.

18  Q    What does it say there?  What does it mean?

19  A    It says use consolidation principles.  It says that the

20  konsern accounts, the group accounts, include the mother

21  company and companies where the mother company has deciding

22  influence, I think as a majority, directly or indirectly.

23           MR. LETOURNEAU:  Your Honor?  Apologies,

24  Mr. Krohn-Hansen, but I would move to strike.  There's no

25  way that those three words convey all of that information.

1  BY MR. GAITAS:

2  Q    Do those three words convey all of that information,

3  sir?

4  A    No.  I was not referring to the three words.  I was

5  referring to the prior paragraph.

6         THE COURT:  I'm going to sustain the objection

7  that Mr. Letourneau made, and Mr. Hansen, if you'd do me a

8  favor and just make sure you answer specifically the

9  question --

10         THE WITNESS:  Okay.

11         THE COURT:  -- that counsel asks you and --

12         THE WITNESS:  Okay.

13         THE COURT:  -- I fully understand you want to --

14         THE WITNESS:  Apologies.  Apologies.

15         THE COURT:  We do a question and answer format, so

16  just make sure you answer the question that Mr. Gaitas asks

17  you.

18         Mr. Gaitas, you may proceed, sir.

19      (No audible response.)

20         THE COURT:  George, I think you're on mute.

21         MR. GAITAS:  I am, yes.

22         THE COURT:  I thought you were just collecting

23  your thoughts, so.

24      (Laughter.)

25         MR. GAITAS:  No, Your Honor.  It's kind of a -- I

1   lost all of you and the witness.  I don't know what it

2   means.

3   BY MR. GAITAS:

4   Q    Now, Mr. Krohn-Hansen, at ECF page 271 through the

5   translation of what we just discussed, does it indicate that

6   the companies filed consolidated statements -- annual

7   statements -- financial report, rather, correction, that the

8   five consolidated financial reports?

9   A    It does indicate.  So it consolidate financial

10  statements.

11  Q    In efforts to get work, that is employed by this

12  konsern, I refer you to note 3, which is at ECF 273, the

13  Norwegian and ECF 248.  See that?

14  A    Yes.  It says the company has no employees, but the

15  group has 200 employees.

16  Q    With regard to support, if any, that the companies in

17  the konsern lend each other, at note 11, page 250, in

18  respects to ECF 276, do you see anything in there regarding

19  now the companies makes reports of each other?

20  A    Yes.  I see the Bergshav Shipping AS, as provider and

21  guarantee to the lender in Bergshav Shipping, LTD.  So the

22  total was $26 million at the first of December '19 and

23  Bergshav Shipping AS is also provider guarantee to the

24  lender in Bergshav (indiscernible) of the deed, where the

25  understanding it was 14.9 million (indiscernible) referred

1  to December '19.

2  Q    With reference to the ownership of the assets that are

3  employed in the konsern, and I refer you to paragraph 41 of

4  your Declaration, you quote -- you quote a portion of the

5  annual report.  How are the assets that are included -- how

6  are the assets of the group have you forwarded in that

7  paragraph?  Are they -- and then find the assets of each

8  subsidiary, or is that assets of the group?

9              MR. LETOURNEAU:  Your Honor.

10             THE WITNESS:  The --

11             THE COURT:  Hold on.  Mr. Letourneau has an

12  objection.

13             Go ahead, Mr. Letourneau.

14             MR. LETOURNEAU:  I object that these documents

15  speak for themselves and (glitch in the audio) --

16             THE COURT:  I'm going to sustain that objection.

17  BY MR. GAITAS:

18  Q    Mr. Hansen -- Krohn-Hansen, looking at the Norwegian

19  text of that, does it bear out -- let's say in paragraph 41

20  of your Declaration?

21  A    So it's the --

22  Q    Yes.

23  A    -- exclusivity period?

24  Q    Yes, and that being ECF page 240.

25  A    Can you repeat your question?

1  Q    Does it bear out what you said in the Declaration at

2  paragraph 41?

3  A    Yes.  It does.

4  Q    Okay.  And is there anything else from having reviewed

5  these 2019 annual statements that identified what the

6  members have in common?

7  A    Well, they share the same chairman of the board, all of

8  them.  And it's the chairman of the board.  I don't know

9  where it's -- paragraph 7.

10 Q    Okay.  Have you had --

11 A    I missed --

12 Q    Excuse me.  Finish your answer, please.

13 A    And they share the same management company, Bergshav

14 Management AS.

15 Q    Okay.  Have you found occasion to meet Bergshav?

16 A    I met Mr. Bergshav on a couple of occasions, including

17 our office here in Athens.

18 Q    And have you corresponded with him in doing fixtures on

19 behalf of your employer?

20 A    Yes.  He has been involved in negotiations on what

21 started out as a package deal or an aftermath, from LPG

22 carriers, which were meant for new gas (indiscernible).  At

23 the end of the day it didn't turn out to become a package

24 deal, but we fixed the aftermath (indiscernible) fixed to

25 (indiscernible), which was 100 percent controlled by

CHRISTIAN KROHN-HANSEN - DIRECT BY MR. GAITAS                    34

1  Bergshav Shipping AS on both.  We ended up fixing the

2  (indiscernible) tires as well.

3             MR. LETOURNEAU:  I think he might be --

4             THE COURT:  You're on mute, Mr. Hughes.

5        (Pause in the proceedings.)

6             THE COURT:  I think he's frozen.

7             MR. LETOURNEAU:  Looks like it.

8             THE COURT:  We'll give him a minute here,

9  obviously.

10       (Pause in the proceedings.)

11            THE COURT:  If you can hear us, Mr. Hansen, we can

12 hear you loud and clear, so.

13            THE WITNESS:  That's good -- all the way from

14 Athens.

15            MR. CHALOS:  Hello?  Hello?  Yeah, you're present.

16            All right.  Unmute yourself.

17            THE COURT:  You're still on mute, Mr. Gaitas.

18            MR. GAITAS:  Your Honor, can you see or hear me?

19            THE COURT:  Now we can hear you.

20            MR. GAITAS:  We had an incident there, an interval

21 where were -- you were all frozen and I was frozen and the

22 witness was frozen.

23       (Laughter.)

24            THE COURT:  I think for all of us, we could all

25 talk and hear each other.  It was you who was frozen.  But

1   nonetheless I'm glad we have you back, and so the question

2   is your question.

3   BY MR. GAITAS:

4   Q     Okay.  You mentioned that you had corresponded with

5   Mr. Bergshav in the fixture of a vessel called the

6   (indiscernible), correct?

7   A     Correct.

8   Q     And it was included in the correspondence?

9   A     Correct.

10  Q     And at the same time it was going to be a package deal,

11  as we said, that would involve also some other gas ship

12  (indiscernible), correct?

13  A     Initially the discussions were for a package deal

14  including also the (indiscernible) of goods, yes.

15  Q     And Mr. Bergshav was corresponding back and forth with

16  you and others in Europe?

17  A     Yes, correct.

18  Q     And that discussion was substantive about chartering?

19  A     Yes.

20  Q     And the (indiscernible) was eventually chartered; is

21  that correct?

22  A     The (indiscernible) was the one chartered.

23  Q     And what kind of ship is the (indiscernible)?

24  A     She's an (indiscernible) anchor.

25  Q     And who was the charterer?

1  A    Charterer was Self Berranas AS (phonetic).

2  Q    And you know who are the shareholders or owners of Self

3  Berranas is?

4  A    That's Bergshav Shipping AS who owns 100 percent.

5  Q    And I will take you now to another area and that will

6  revert to Mr. Hanovich's Declaration, which was starting at

7  chart starting at ECF page 53.  And specifically I'll go

8  back again to paragraphs 10 and 11 of his Declaration.

9  A    Yes.

10 Q    And you see there where he is -- without elaborating

11 and reading it out, he refers to sale of the ships by B-Gas

12 Limited, correct?

13 A    Correct.

14 Q    And an arrangement called "Sale and Lease Back."

15 A    Correct.

16 Q    Now Mr. Krohn-Hansen, you have experience in sale and

17 purchase of vessels?

18 A    I do.

19 Q    And over the years?

20 A    Over many years, there were many vessels.

21 Q    And you've (indiscernible) actually?

22 A    I have been in -- (indiscernible) the translation.

23 Q    And when there is an S&C transaction, is there any

24 particular kind of communication that is used by the parties

25 in doing it?

1   A      First, the role of my Memorandum of Agreement, which is

2   basically the contract for the sale of the ship.

3   Q      Yes.

4   A      Then you have the Bill of Sale, which is you can call

5   the receipt that the ship has been delivered and changed

6   owners.

7   Q      Yes.

8   A      When it comes to the lease back, you expect to see a

9   (indiscernible) boats charge policy for the lease back of

10  the vessel.

11       And last, but not least, you expect to see proof of

12  payment.  There is no sale without money.

13  Q      And have you seen any documents regarding the

14  transactions that Mr. Hanavich purports to place in

15  paragraphs 10 and 11 of his Declaration?

16  A      Must be anything.

17  Q      Have you -- as a broker, a chartering broker, you keep

18  your eyes and your ears on the market to see who buyed what

19  and who charters what; is that correct?

20  A      Correct, correct.

21  Q      And what -- you checked the reports?

22  A      I do on a daily basis.

23  Q      Do you check S&P, Sale and Purchase reports?

24  A      I do so on a daily basis.

25  Q      Have you seen any of these transactions in a report in

1  Mr. Hanovich's Declaration reported anywhere?

2  A    Never, no where.

3  Q    Now I note that (glitch in the audio) and I hope I

4  don't -- I'm still on live, yes?

5          THE COURT:  Yes, everybody is online.

6  BY MR. GAITAS:

7  Q    If you refer to Mr. Hanovich's Declaration,

8  particularly exhibits that are attached to it, starting at

9  ECF page 37 and going forward to page 44, is that?

10 A    Yes.

11 Q    In these documents you will see starting with the very

12 first one at page -- it's page 35.  Do you see that?

13 A    Yes.

14 Q    Do you see a name of Mr. -- one of the directors

15 present at the meeting and reported in these minutes, a

16 Mr. Briones Kepereses (phonetic)?  Do you see that?

17 A    I see that, yes.

18 Q    And if you peruse through the remaining pages, you will

19 see the name of Mr. Briones Kepereses as a director.

20 A    Yes, I see it.

21 Q    And also, there is the name of a also director,

22 Mr. Dieter Rothenburg (phonetic).  Do you see that,

23 Mr. Dieter, D-I-E-T-E-R, R-O-T-H --

24 A    Yes.

25 Q    And B-U-R-G, as another director?

1  A      I see those as well, yes.

2  Q      Bergshav Maritime that manages the Plaintiffs' vessels,

3  make any inquiry regarding the role the individuals played

4  in the management of the company, and more particularly the

5  events of the sale of the vessels?

6  A      So Maritime, yes, made many inquiries of these

7  individuals with their employers and we have also made an

8  interview directly with Mr. Kepereses through a Cypress

9  attorney called Sobaticus (phonetic).

10 Q      What have you learned from the investigation you did?

11 A      We have learned that this individuals work for a

12 company called Internship Navigation Company, in addition to

13 a related company called Dominic Bankers (phonetic).  This

14 individuals were on the board of Bergshav Shipping, Ltd., as

15 well as on the board of B-Gas Limited.

16 Q      And what role did they play?  Did they participate --

17 do you know from the information you got, if they

18 participated in the decisions made to sell the vessel?

19          MR. LETOURNEAU:  Objection; (glitch in the audio).

20 Your Honor, (glitch in the audio) personal knowledge

21 (indiscernible).

22          THE COURT:  Well, I'm going to rule to the

23 objection.  The question is "Do you know?"  If you know,

24 say.  If you don't, say you don't know.

25          THE WITNESS:  If I know that -- well, from what

1  we've learned they were not aware of the sale of this

2  assets.  They were not aware of the sale of the ships and

3  were not aware of the sale of B-Gas AS.

4           MR. LETOURNEAU:  Again, Your Honor, I move to

5  strike; it's beyond his personal knowledge, not saying

6  (indiscernible).

7           THE COURT:  I'm going to sustain that objection

8  and strike that testimony.

9  BY MR. GAITAS:

10  Q    Do you know, Mr. Krohn-Hansen, if these directors were

11  hiring employees of B-Gas AS?

12  A    From sitting on the (indiscernible) directors on the

13  board, they must have been paid something by B-Gas Limited.

14           MR. LETOURNEAU:  Your Honor, I move to strike.

15  Again, it's beyond his personal knowledge.

16           THE COURT:  I'm going to sustain the objection and

17  strike that.

18           And make sure, Mr. Hansel, if you know for certain

19  and have personal knowledge, say so.  If you don't have

20  personal knowledge, then say so on these questions.

21           Mr. Gaitas, proceed, sir.

22  BY MR. GAITAS:

23  Q    Mr. Krohn-Hansen, has anyone from Stealth Maritime

24  spoken or communicated with these individuals; namely

25  Mr. Keperses and Mr. Chrome (phonetic) and Mr. Rothenburg?

1   A     We have after the recreation of the terms of

2   (indiscernible), not before.

3   Q     And after, what did you learn the role was in the

4   management in B-Gas Limited?

5   A     We learned that they were mere nominee directors of the

6   company.

7   Q     What does nominee --

8           MR. LETOURNEAU:  Again, Your Honor, I move to

9   strike.  Not saying that here, they're saying that the

10  companies.

11          THE COURT:  I'm going to sustain the objection.

12          MR. GAITAS:  All right.  I have no further

13  questions for this witness, Your Honor.

14          THE COURT:  Thank you very much, Mr. Hansen.

15          Mr. Letourneau, is it safe to assume you have a

16  few questions?

17          MR. LETOURNEAU:  Yes.  Yes, I do, Your Honor.

18          THE COURT:  Let's do this:  Let's take five

19  minutes, allow everyone to get a glass of water, get their

20  composure and maybe get a little bite to eat, and we'll be

21  off the Record and resume in five minutes.

22       (Recess taken from 12:11 p.m. to 12:20 p.m.)

23                       AFTER RECESS

24          THE COURT:  Okay.  Are we ready to proceed?

25          MR. LETOURNEAU:  Yes, Your Honor.

1           MR. GAITAS:  Yes, Your Honor.

2           THE COURT:  Okay.

3           MR. CHALOS:  Yes, Your Honor.

4           THE COURT:  And by the way, I know it's around the

5    noon hour here, so if anyone has a small snack or drink,

6    feel free.  I probably will, as well, so don't be hesitant

7    to do that.

8           Mr. Letourneau, the witness is yours, sir.

9           MR. LETOURNEAU:  Thank you, Your Honor.

10          I'm going to be asking my associate, Mr. Cain, to

11   bring up a couple of documents on the shared screen if

12   that's permissible?

13          THE COURT:  Absolutely.

14       CROSS-EXAMINATION OF CHRISTIAN KROHN-HANSEN

15   BY MR. LETOURNEAU:

16   Q    So the first thing I'd like to look at, Mr. Krohn-

17   Hansen, is the verification accompanying the First Amended

18   Complaint.  And that is document -- got it right here, it's

19   Document 17-1.

20        Do you see that on your screen, Mr. Krohn-Hansen?

21   A    Yes.

22   Q    Okay.  I want -- I just want to read it into the

23   Record.

24        "Pursuant to 28 USC 17 -- Section 1746, Christian

25        Krohn-Hansen declares under penalty of perjury, I'm an

1    individual of sound mind and never been convicted of a

2    crime of moral turpitude.  I am a citizen of Greece and

3    resident of Athens, Greece and the lawful

4    representative of Plaintiff in the above action and

5    duly authorized on its behalf to make verification.  I

6    have read the foregoing verified Complaint and exhibits

7    thereto in the above-captioned action and know the

8    contents thereof.  I declare under the penalty of

9    perjury that the foregoing is true and correct."

10   Did I read that correctly, sir?

11   A    Yes.

12   Q    And is it fair to say, sir, from that, that at the time

13   that you executed that verification on the 22nd of March,

14   2021, that you did not verify the truth of the allegations

15   set forth in the verified Complaint, only that you had read

16   the verified Complaint and the exhibits, correct?

17   A    Correct.

18         MR. LETOURNEAU:  And if we could, I'm not sure,

19   Mr. Cain, if you have it there, but actually I wanted to

20   take a look at the original verification of the Complaint,

21   and that is Document 1-1, and it is dated the 24th day of

22   January, 2021.

23         MR. CAIN:  Yes.  Give me just one moment to pull

24   that up.

25         (Pause in the proceedings.)

1          MR. CAIN:  Okay.  Everybody see that?

2          THE WITNESS:  Yes.

3   BY MR. LETOURNEAU:

4   Q    So, Mr. Krohn-Hansen, this is the verification in the

5   Document 1-1, this is the verification that accompanied the

6   Original Complaint, and it reads:

7          "Pursuant to 28 USC, Section 1746, Christian Krohn-

8          Hansen declares under the penalty of perjury, one, I am

9          an individual of sound mind, have never been convicted

10         of a crime of moral turpitude; two, I am a resident of

11         Athens, Greece and the lawful representative of the

12         Plaintiff in the above action and duly authorized on

13         its behalf to make this verification; three, I have

14         read the foregoing verified Complaint and exhibits

15         thereto in the above-captioned action and know the

16         contents thereof.  And I declare under the penalty of

17         perjury that the foregoing is true and correct."

18         Did I read that correctly, sir?

19  A    Yes.

20  Q    And, again, it's a fair statement to say that you did

21  not verify the truth of the allegations in the Original

22  Complaint, only that you had read the original verified

23  Complaint and the exhibits thereto, correct?

24  A    Correct.

25  Q    So let's look if we could at now in the live pleading,

CHRISTIAN KROHN-HANSEN - CROSS BY MR. LETOURNEAU          45

1   the First Amended Verified Complaint, this is Document 17,

2   and we draw your attention to paragraph 85, which is on

3   page 23.

4          MR. LETOURNEAU:  Mr. Cain, bring that up.

5          MR. CAIN:  Sure.  Eighty-five, you said.

6          MR. LETOURNEAU:  Eighty-five, yes.  Can we blow

7   that up a bit?

8      (Pause)

9          MR. CAIN:  Is it displaying full screen?

10         MR. LETOURNEAU:  It's -- can you -- is it possible

11  to enlarge it so everybody can see it a little bit better?

12         MR. CAIN:  Oh, I'm sorry.  It's showing as full

13  screen on mine.  Hold on.

14         MR. LETOURNEAU:  Maybe it's just my screen.

15         THE COURT:  No, Mr. Letourneau, it's showing full

16  screen.  He's just saying is can you focus in on

17  paragraph 85, make paragraph 85 bigger.

18         MR. CAIN:  Again, on my screen, paragraph 85 is

19  taking up the full screen so I'm -- I apologize.

20         MR. LETOURNEAU:  So we'll just have to go with

21  what we have.

22  BY MR. LETOURNEAU:

23  Q    So, Mr. Krohn-Hansen, can you see paragraph 85 on the

24  screen before you?

25  A    Yes, I can.

CHRISTIAN KROHN-HANSEN - CROSS BY MR. LETOURNEAU                46

1   Q    And it reads:

2        "Defendants Bergshav Shipholding AS and Atle Bergshav

3        used and are continuing to use the purported

4        separateness and the purported separate incorporation

5        of its surrogate subsidiaries, B-Gas Limited, Bergshav

6        Shipping AS, Bergshav Shipping Limited, B-Gas AS,

7        Bergshav Management Company AS, LPG Invest AS, and

8        Bergshav Invest AS, abusively to engage in fraudulent

9        corporate restructuring and asset reallocation

10       practices to avoid paying agreed and accrued hire for

11       the Echo royalty from Lockly Princess (phonetic)

12       insulate their assets from their creditors, and to

13       evade with impunity their obligation arising from their

14       repudiation in the (indiscernible) charter."

15       Did I read that correctly, sir?

16  A    Yes.

17  Q    So my question to you, sir, is with respect to Bergshav

18  Shipping, what specifically are Plaintiffs contending that

19  Bergshav did either fraudulently or wrongfully that harmed

20  the Plaintiffs?

21  A    I think that's for the Court to decide.

22  Q    Do you know of any specific facts that Bergshav

23  Shipping AS engaged in that fraudulently or wrongfully

24  damaged the -- or injured the Plaintiffs in this case?

25  A    At this moment I cannot say I remember what Bergshav

1  Shipping AS did specifically.

2  Q    Okay.  So let's go to paragraph 86.  And this paragraph

3  continues on to the next page.  We're looking again at

4  Document 17, page 23, paragraph 86.  And it reads:

5       "Defendant B-Gas Limited has contracted with Plaintiff

6       and specifically completely dominated surrogate shell

7       entities Bergshav Shipping AS, Bergshav Shipping

8       Limited, B-Gas AS, Bergshav Management Company AS,

9       Bergshav Invest AS, and LPG Invest AS, as alter egos of

10      Bergshav Group, principal entity Bergshav Shipholding

11      AS, and its controlling shareholder and director, Atle

12      Bergshav, and respectively as separate corporations of

13      B-Gas Limited, which they have stripped of its assets,

14      allocated same to themselves, and are using same to

15      continue carrying on business under the B-Gas brand,

16      intending to reap all the benefits of carrying on

17      business but paying none of the costs.  Defendants are

18      accordingly using the corporate forum abusively, that

19      is perpetrate fraud and commit other injustice.  It

20      would be accordingly fair and equitable to pierce or

21      reverse the pierce the corporate veil of Bergshav

22      Shipping AS, Bergshav Shipping Limited, B-Gas AS,

23      Bergshav Management Company AS, and Bergshav

24      Shipholding AS in order to reach the economic value of

25      the entity Bergitta (phonetic), which said Defendants

1          have compartmentalized separate corporate

2          (indiscernible)."

3          Have I read that correctly, sir?

4     A    Yeah.  I didn't see everything before (indiscernible).

5               MR. LETOURNEAU:  Can you picture this -- see

6     everything, Mr. Cain?

7               MR. CAIN:  Just let me know when to move to the

8     next page.

9               THE WITNESS:  Okay, you can move.

10    BY MR. LETOURNEAU:

11    Q    Fair to say that I read that correctly?

12    A    It would seem so, yes.

13    Q    Yeah.  And so my question to you, sir, is what is it

14    that Bergshav Shipping AS did to strip those companies of

15    its assets?

16    A    This is not for me to decide.  This is for the Court to

17    decide.

18    Q    Do you have any facts that Bergshav Shipping AS

19    received any of the sales, assets, or proceeds from the sale

20    of the vessels that --

21    A    Yeah, facts will be -- the facts will be decided by the

22    Court.

23    Q    So is it fair to say then that as you -- as we sit here

24    today, you do not know of any facts involving Bergshav

25    Shipping AS relating to the sale of or purchase of those

1  vessels; is that a fair statement?

2  A    At this moment, because there are many companies

3  involved in the Bergshav group, I cannot right now say what

4  Bergshav Shipping did or did not do.  This is something that

5  the Court has to decide on the basis of the evidence

6  provided.

7  Q    So there's another statement here where it says

8  Defendant accordingly using corporate forum abusively, that

9  is to perpetrate fraud and commit other injustice.  My

10  question to you, sir, is what fraud or other injustice has

11  Bergshav Shipping AS specifically committed?

12  A    Again, that is for the Court to decide.  I cannot

13  decide that.

14  Q    A fair statement as we sit here today that you don't

15  have any facts that demonstrate that Bergshav Shipping AS

16  perpetrated any fraud or committed any other injustice,

17  correct?

18  A    Again, this is for the Court to decide.

19  Q    So, Mr. Krohn-Hansen, you are the chartering manager

20  for Stealth Maritime, correct?

21  A    Correct.

22  Q    Did you negotiate the bare boat (phonetic) charters and

23  the Eco vessels?

24  A    I did, yes.

25  Q    With Bergshav.

 1  A    Correct.

 2  Q    And you had the opportunity during the course of your

 3  negotiation to request or negotiate for any type of parental

 4  guarantee with respect to securing performance under those

 5  bare boat charters (indiscernible)?

 6  A    Guarantee was brought up at some point.  But after

 7  significant discussions with the broker as well, it was said

 8  that because Bergshav is standing behind B-Gas, there is no

 9  need for corporate guarantees.

10  Q    But that was a decision that you made, as opposed to in

11  terms of whether or not to improve the corporate guarantee.

12  You decided ultimately not to negotiate for corporate

13  negotiate for corporate guarantee from the parent company,

14  correct?

15  A    We requested a corporate guarantee.  It was not agreed

16  to when we requested it.  So because of the whole

17  circumstances, the Bergshav structure, et cetera, the long

18  history of that company, we decided that we could do

19  business without the corporate guarantees.

20  Q    In fact, when is it that you first learned that there

21  was a liquidity issue with respect to B-Gas?

22  A    Like I said in my correction earlier, the first time

23  was in an email on the 30th of April, 2020.

24  Q    And did B-Gas pay Stealth or the owners the charter

25  hire that was due for the month of April?

1  A    For the month of April they did, yes.

2  Q    And fair to say that you -- do you manage those

3  accounts in terms of receipt of hire or do you monitor that

4  and you are familiar with the receipt of hire for the

5  various vessels under the Stealth banner?

6  A    Generally I would know one hires an update.  We have --

7  we control 80 ships.  I cannot individually fix all of

8  this --

9  Q    Understood.

10  A    -- nor the payment as well.

11  Q    Okay.

12  A    But if there are problems with the payments, I will be

13  told, yes.

14  Q    Understood.  And fair to say that the charter hire for

15  these three vessels was paid in May of 2020, correct?

16  A    Yes.

17  Q    And also in June of 2020, correct?

18  A    Correct.

19  Q    And also in July of 2020, correct?

20  A    Correct.

21  Q    And also in August of 2020, correct?

22  A    Correct.  I -- the default was in September some time.

23  Q    Okay.  And when the default occurred in the fall of

24  2020, you were apprised of that default by B-Gas or a

25  problem with that vessel?

1  A     If we were surprised?

2  Q     No, no.  You were apprised.

3  A     Apprised, don't know anything about apprise.

4  Q     You were notified.

5  A     Oh, yes, we were.

6  Q     Okay.  So do you have any evidence as we sit here today

7  that Bergshav Shipping AS received any assets as a result of

8  the alleged asset stripping?

9  A     Sorry, can you repeat that?

10 Q     Sure.  Do you have any evidence as we sit here today

11 that Bergshav Shipping AS received any assets as a result of

12 the alleged asset stripping?

13 A     That is again for the Court to decide based on what has

14 been declared.

15 Q     And you would also agree with me that the Bergshav

16 Shipping As was not involved in the bare boat charter

17 transaction involving the three Eco vessels that are at

18 issue, correct?

19 A     That Bergshav AS was not involved?  Bergshav AS,

20 Shipping AS is not involved in the charter barges, mainly

21 the charter barges.  But there were several people that also

22 act on behalf of Bergshav Shipping AS that were involved in

23 dealings with the bare boat charter partners for the vessels

24 both before delivery and after delivery of the ship.

25 Q     But as in terms of the actual contracting, you were

1  involved in the contracting for those vessels and Bergshav

2  Shipping AS was not a party to those bare boat charter

3  agreements, correct?

4  A    In the bare boat charter, Bergshav Shipping AS, yes,

5  that is correct.

6  Q    Are you aware under Norwegian law, Mr. Krohn-Hansen,

7  that you cannot enter into a contract with a "konsern," that

8  is the Norwegian word, K-O-N-S-E-R-N, that own with a

9  company which is a part of a "konsern?"

10  A    If I knew that?

11  Q    Under Norwegian law.

12  A    No.  I did not know under law.

13  Q    And were you also aware that under Norwegian law that

14  you cannot go after the assets of any other company within a

15  "konsern," other than the company with whom you have

16  contracted?

17          MR. GAITAS:  Same objection.

18          MR. LETOURNEAU:  Judge, you are muted.

19          THE COURT:  Hold on, Mr. Gaitas.  I didn't hear an

20  objection before.  What is the objection?

21          MR. GAITAS:  The objection is he's examining under

22  Norwegian law in which my learned friend disqualified him

23  earlier, it was not granted so.

24      (Clerk/Unidentified speaker confer)

25          MR. LETOURNEAU:  Your Honor, I think that's all

1  the questions that I have for Mr. Krohn-Hansen.

2          THE COURT:  Okay.  Mr. Gaitas, anything further,

3  sir?

4          MR. GAITAS:  Your Honor, very briefly.

5        REDIRECT EXAMINATION OF CHRISTIAN KROHN HANSEN

6  BY MR. GAITAS:

7  Q    Mr. Krohn-Hansen, you negotiating charter parties for

8  the Stealth Berana?

9  A    Yes.

10  Q    Who was your counterparty in the negotiations of the

11  Stealth Berana?

12  A    The company we were negotiating with?

13  Q    Yes.

14  A    That was -- it was Stealth Berana AS that the ship was

15  fixed to but it was mentioned in the charter party that

16  Stealth Berana AS was a hundred percent owned by Bergshav

17  Shipping AS.

18  Q    And believe my question is, with whom were engaging in

19  negotiations for the Stealth Berana from -- in order to do

20  the charter party?  With whom did you exchange emails and

21  spoke with?

22  A    The name of the guy, well, Mr. Hanavich was both.  And

23  there was a guy called -- I don't remember the name,

24  Stein-something.  I don't have the surname right now.

25  Q    And once you negotiated with Mr. Hanavich and Mr. Stein

CHRISTIAN KROHN-HANSEN - REDIRECT BY MR. GAITAS                    55

1   (phonetic), which hat did they wear?  Were they wearing any

2   particular -- they identify with any particular company in

3   emails, were they identify the company they worked for?

4   A    Not -- well, they use the Bergshav email accounts.

5   Exactly what it says on their signatory, difficult for me to

6   say right now.

7   Q    When you testified that on cross-examination regarding

8   the June, July, August hires were received, when these hires

9   were received, did you know that your charter, Bergshav

10  Shipping Limited -- excuse me, B-Gas Shipping Limited did

11  not own the ships anymore?

12  A    No, we did absolutely not.

13  Q    When you were asked by my friend about the guarantee,

14  that you might have requested a guarantee, when you were

15  doing the fixtures, did you have any reasons whatsoever to

16  believe that the company was going to eventually get rid of

17  its assets?

18  A    We have no reason to believe that at all.  And like I

19  said, the history of Bergshav as a company was more than

20  reassuring in itself for us when we fixed those ships.

21  Q    Just as a practical matter, Mr. Krohn-Hansen, you have

22  been in the chartering business for a long time.  And when

23  it comes to fixing with somebody you know, there are two

24  kinds of potential charters.  There are operators who don't

25  own any (indiscernible) and there owners and operators, both

1  (indiscernible) of their own.  Which is the best party to

2  take out a charter among them?

3  A    Without a doubt those that own assets because then you

4  have something to go after in case of a default.

5          MR. GAITAS:  Thank you very much.  I have no

6  further questions of this witness.

7          THE COURT:  Mr. Letourneau?

8          MR. LETOURNEAU:  Your Honor, may I follow up?

9          THE COURT:  Absolutely.

10          MR. LETOURNEAU:  Mr. Krohn-Hansen, just a couple

11  more questions for you, sir.

12          RECROSS-EXAMINATION OF CHRISTIAN KROHN-HANSEN

13  BY MR. LETOURNEAU:

14  Q    With respect to learning about the liquidity issues in

15  April of 2020, isn't it true at that time that you had the

16  opportunity as the contracting party to go back to B-Gas and

17  request some form of performance guarantee when you learned

18  that there were liquidity issues?

19  A    I'm not sure what you mean by that.

20  Q    Well, in other words, at that point in time you learned

21  information from your contracting party that they were

22  having liquidity issues.  They asked for concessions in

23  terms of the payment of hire.  And Stealth apparently

24  managing these three vessels and declined that invitation.

25  But isn't it also true that you could have requested

1  parental guarantees of performance at that point when you

2  learned of this liquidity issue?

3  A    Well let me turn that around.  It should have been

4  offered to me.  I wasn't the defaulting party.

5  Q    But still you had the opportunity to request a

6  performance guarantee when you learned of the liquidity

7  issues --

8  A    This was never brought on the table by the other side.

9  Q    That doesn't prevent you from raising it when you

10  learned of the liquidity problems, correct?

11  A    Yes, but this is not something that we run around

12  doing.

13          MR. LETOURNEAU:  No further questions, Your Honor.

14          THE COURT:  Okay.  Thank you very much.

15          Mr. Hansen, you may step down from the proverbial

16  witness stand.

17     (Witness excused.)

18          THE COURT:  Is there any more testimony that we

19  need to have today, Mr. Gaitas or Mr. Letourneau?

20          MR. GAITAS:  No, Your Honor, not from the

21  Plaintiffs' side.

22          MR. LETOURNEAU:  And none from the Defendants,

23  Your Honor.

24          THE COURT:  Let me do this.  I guess I'm curious.

25  I want to take a break for a minute to talk to my law clerk

1    but I got a couple questions when I get back.  I guess the

2    thing I think I'm going to start when I get back -- and by

3    the way, I'll have a few questions and I want to hear from

4    you all when get an opportunity.  As I said, I've read

5    everything so don't rehash this in writing.

6          But I'm curious specifically for each of you to

7    address what specifically about the testimony today is any

8    different or helpful to each of your respective causes from

9    your perspective.

10         So let's go off the Record for just a couple

11   minutes and I'll be right back.  Thank you.

12        (Recess taken from 12:47 p.m. to 12:54 p.m.)

13                        AFTER RECESS

14         THE COURT:  Okay.  Are we ready to proceed,

15   Mr. Gaitas, Mr. Letourneau?

16         MR. GAITAS:  Your Honor, we're ready to proceed.

17         THE COURT:  Okay.  I guess -- well, trying to

18   figure out who I was going to let go first since it is --

19   Mr. Gaitas is the Plaintiff.  But then again Mr. Letourneau

20   filed a Motion to Vacate.  But I guess really doesn't matter

21   which order you go in.

22         I guess to start off, Mr. Gaitas, I guess I'm

23   curious just for your -- to opine on how the testimony today

24   in your view helped your cause or showed that there should

25   be -- the attachment should remain.  And then obviously I'm

1  going to give Mr. Letourneau the opportunity to say the

2  exact opposite.

3         MR. GAITAS:  Your Honor, I think there are two

4  points because this is essentially, and Your Honor knows,

5  these motions in this issue of a Motion to Vacate, the

6  issue, and when it comes to particularly corporate veil

7  piercing and alter egos, the issue is one of fact.  And at

8  this stage of the hearing, our burden is to make a *prima*

9  *facie* case.  We don't have to prove our case.  We have to

10  make a *prima facie*.  And there has been activity and

11  relationships of the companies such that would justify the

12  Court to sustain the attachment because down the road we

13  have a good chance of proving there is an alter ego issue

14  that would justify the attachment.

15         The testimony brought out clearly that what

16  happened was asset stripping of the charter clean.  All of

17  its assets were sold, including the company that they used

18  in order to do their chartering activity, their commercial

19  management.  And from previous -- the previous filing, what

20  is clear is these vessels are being operated now because the

21  same company and the Plaintiff have no inkling, no idea what

22  was being pulled on them.  They were given a choice, give us

23  a discount or else.  And then what happened is the assets of

24  the debtor was stripped clean and they were transferred to

25  another ad hoc company, which is LPG Invest AS.  It's

1  70 percent -- actually 75 owned by B-Gas AS, B-Gas Holdings

2  AS.  And the vessels are being traded.  So that's *prima*

3  *facie* that's necessary for making alter ego.

4         So if you confirm that there were no sale, there

5  were no backup sale documents, such as a Memorandum of

6  Agreement, a Bill of Sale, and no proof of money change

7  hands, just that the ships shifted ownership.  And our

8  clients had no idea, they were not told that their charter

9  was being stripped, was being relieved of all of its worldly

10  goods.  And to top that, of course as we have pled, now they

11  started an insolvency in Cypress and changed -- even changed

12  the name of the companies, Bepalo.

13         So, yeah, things that came out in the testimony of

14  Mr. Krohn-Hansen is the relationship between the entities of

15  the Bergshav Shipholding AS group, these are subsidiaries

16  who have a close, working relationship on many things:  in

17  financial, they guarantee each other's debts, they have the

18  same personnel.  Bergshav Shipping AS doesn't even have any

19  employees, just a holding company, it holds things.  But

20  they share services, they share financial services with each

21  other.  They come up out in the world as a solid group.  And

22  then when the crunch comes down and they want to disband it,

23  what happens is, oh, these companies didn't receive

24  anything.  The other two sister companies receive something

25  and that was shown they received something.  But the parent

1   -- the sister company that owns the ship didn't receive

2   anything.  But they are the same group that benefits from

3   each other's gains and lose from each other's losses.

4        So these are the two points which Mr. Krohn-

5   Hansen's evidence was good that he confirm the nature of the

6   group that is based on Norwegian filing records and accounts

7   and also he confirmed that there was the stripping activity

8   nobody knew anything about.  And that is -- I don't want to

9   make a legal argument, Your Honor, but Your Honor is -- have

10  cited the case of *Talen's Landing* from the Fifth Circuit and

11  the case that Judge Schwartz which is cited in the long,

12  long footnote whereby the Fifth Circuit and the Eastern

13  District of Louisiana decide that really, really disapprove

14  of this sort of practice that justifies piercing the

15  corporate veil on an alter ego theory, which is the debtor

16  company stripped and other companies set up to take the

17  assets, and the creditor is left holding the bag.

18        This is a clearly -- the Fifth Circuit called that

19  reprehensible.  And of course it allowed piercing of the

20  corporate veil.  This is what testimony of Mr. Krohn-Hansen

21  illustrates.

22        And I think the point is for us to make at this

23  stage a *prima facie* hearing or show probable cause.  Your

24  Honor, you're a U. S. Magistrate Judge.  You know what

25  probable cause is and you can assess it.  And I think I

1   would respectfully argue we have made that.

2            THE COURT:  Okay.  Thank you very much.

3            Mr. Letourneau, give you the floor.

4            MR. LETOURNEAU:  Your Honor, to answer your

5   question, what did the testimony reveal that was favorable

6   to the Defendant?  In our estimation what it revealed was

7   that there was no verification at the time the Original

8   Complaint was filed, jurisdiction in the Court is determined

9   at the time the suit is filed.  And Mr. Krohn-Hansen's

10  testimony demonstrated that he did not verify the

11  allegations in the Original Complaint nor did he verify any

12  allegations in the First Amended Complaint.  And that is

13  especially important when you're talking about an ex parte

14  pre-judgement seizure of property.  And that did not happen

15  in this case.  So from our perspective there was a lack of

16  jurisdiction at the outset of this case because the vessel

17  was seized without a properly verified Complaint having been

18  filed.

19           The evidence also demonstrates emphatically I

20  think that there was no fraud or injustice, no evidence of

21  it, that they have either in their pleadings or from

22  Mr. Krohn-Hansen concerning the involvement of Bergshav

23  Shipping AS.  There's also no evidence of the transfer of

24  any assets or sales proceeds following those sales or lease

25  backs to Bergshav Shipping AS.

1          Mr. Krohn-Hansen also admitted that the charter

2    hire continued to be paid after the announced liquidity

3    problems in the spring of 2020.  So there was no breach of

4    contract by virtue of the clause that he cited to because

5    they established some liquidity and sold the vessels to

6    obtain liquid assets in order to pay their debts, and that's

7    exactly what they did until such time as in the fall of 2020

8    when it became evident that they were going to go insolvent

9    and could not pay the debt, and that's when they advised the

10   owners of the problem.  So that's what I think the testimony

11   revealed today.

12          I would like to address if I might, Your Honor,

13   the various issues concerning alter egos criteria, reverse

14   veil piercing, and the single business enterprise aspects,

15   as well as the corporate relationship between Bergshav

16   Shipholding AS and Bepalo, if you might indulge me?

17          THE COURT:  I absolutely will.  Let me ask a

18   couple questions first, but I'm going to give you a full and

19   fair opportunity, Mr. Letourneau, to address all of that.

20          Let me just make sure I understand the standard

21   that needs to be applied here just so we're all on the same

22   page.  Because as I sort of -- after reading all the case

23   law, you know, the question here at this stage is whether

24   the Plaintiff has shown a valid *prima facie* admiralty claim,

25   whether the Defendant cannot be found in the district,

1   whether Defendants' property may be found in the district,

2   and whether there is no statutory or merited -- maritime law

3   bar to the attachment.  And I guess the question, and I've

4   seen from the case law sort of spells out, you know, what is

5   that standard?  You know, it seems like, you know, it's

6   comparable, but maybe slightly more onerous than the

7   standard applied to a 12(b)(6) context, but at the same time

8   it's not a final dispositive, you know, look, this is the

9   ultimate factfinder.  You know, I guess when I view it as

10  not saying that it clearly is or clearly isn't, you know,

11  one side's right or wrong, but help me out, understand this,

12  give your thoughts on that, both sides, on the standard;

13  because I think that's sort of, at least in the way I've

14  been thinking about it, that sort of help guides my analysis

15  on, you know, do I need to consider -- well, that's sort of

16  my thoughts.

17          So Mr. Letourneau.

18          MR. LETOURNEAU:  Your Honor, based on my dealings

19  in these cases over the years I -- my thinking is that the

20  Court -- the standard at this stage of the (E)(4)(f)(3) is

21  just generally probable cause.  It hasn't been articulated

22  with a great deal of clarity amongst the cases and there --

23  they haven't talked about any different fashion.  But they

24  -- that is my general sense is that the probable cause is

25  the standard at this stage of the proceeding.  If the case

1  went through the discovery and we complete discovery and we

2  come back to you and file Motion for Summary Judgment, then

3  the standard increases to preponderance of the evidence at

4  the summary judgment stage.  But, candidly, case law is not

5  a model of clarity but I'm of the view that it most likely

6  is probable cause or standard that governs that

7  (indiscernible).

8          THE COURT:  And, Mr. Gaitas, it sounds like from

9  your comments earlier you actually probably agree with that,

10  correct?

11          MR. GAITAS:  I agree with that, Your Honor.  And I

12  would just point out one, the granddaddy of all of the

13  ruling cases the *Swift and Cole versus Compania* (phonetic),

14  I can cite it, but I can't remember, but it is from the U.

15  S. Supreme Court and they say they are reasonable grounds,

16  so you have a choice, Your Honor.  In New York, they say you

17  have to make a *prima facie* case; most of the courts in the

18  Second Circuit.

19          In this circuit they have talked about -- recent

20  courts, have talked about probable cause.  And you have the

21  unfortunate role of saying whether these things mean the

22  same thing or they part.  I don't think they part.  I think

23  this is -- it is for the Court to solve this.  But if in

24  common parlance have -- it's a pleading standard.  That's

25  what I am certain about, it's a pleading standard.  And --

1              THE COURT:  I apologize.  Go ahead.

2              MR. GAITAS:  And the pleading standard was met and

3    we can go beyond the pleading standard and present evidence

4    then if it's challenged.  And --

5              THE COURT:  The other thing I wanted to ask about,

6    from reading Mr. Letourneau's brief, obviously -- and you

7    just mentioned again this fraud injustice argument, which

8    basically has as I understand it, hey, they can't show

9    there's some sort of fraudulent act that went on.

10             As I understand Mr. Gaitas' response is in effect,

11   hey, I'm not required to show that there's any fraud, and

12   there's a citation to this Judge Ramos opinion down in the

13   Southern District of Texas, you know what I'm talking about,

14   in maritime cases Federal common law does not require a

15   showing of actual fraud to pierce the corporate veil,

16   obviously citing the *Talen's Landing* case that Mr. Gaitas

17   referred to earlier.

18             Help me out, Mr. Letourneau.  What's your response

19   or is that just an incorrect statement of the law?

20             MR. LETOURNEAU:  Well, Your Honor, --

21             THE COURT:  Go ahead, I'm sorry.

22             MR. LETOURNEAU:  Sorry.  Your Honor, I believe the

23   distinction is fraud requirement needs to be imposed by the

24   Fifth Circuit when you're talking about breach of contract.

25   And that's what we're talking about here is that this is a

1    breach of contract intertwined (indiscernible), you're

2    applying to all three of those standards from the Fifth

3    Circuit, the *Bridas* decision from 345 F.3d 347.  The owner

4    exercises complete control over a corporation with respect

5    to transactions at issue and such control was used to commit

6    fraud or wrong that injured the party seeking to pierce the

7    corporate veil.

8         And in this case, we have none of that in respect

9    to Bergshav Shipping AS.  There's no evidence of fraud.

10   There's also a pleading requirement under Rule 9(b) for

11   pleading fraud with particularity when you're basically

12   establishing who, what, when, where, and how the fraud

13   occurred.  Mr. Krohn-Hansen testified there -- they clearly

14   have no evidence of fraud with respect to Bergshav Shipping

15   AS.

16        THE COURT:  My understanding, I mean, Mr. Gaitas

17   has already been -- correct me, if I'm misstating it,

18   Mr. Gaitas, is you don't need to show fraud at this stage.

19        MR. GAITAS:  No, Your Honor, I don't think that we

20   need to show common law fraud for sure and you don't need to

21   show fraud at this stage.  The standard that I would rely on

22   is the one in the *Bordagain* (phonetic) case. which is if in

23   an alter ego situation or corporate veil situation there is

24   such evidence, the -- you sustain it against the evidence of

25   wrongdoing, no fraud, wrongdoing, I don't know if I would

1  call it fraud but the evidence of wrongdoing is such if

2  uphold -- if you uphold the corporate veil in circumstances

3  where there's such wrongdoing that upholding it would lead

4  to an absurd result, then you have to pierce the corporate

5  veil.

6           If you sustain -- and the classic pattern in the

7  *Bordagain* case was the case from the Seventh, and Judge

8  Schwartz decided it.  And he said the factual pattern before

9  him was there was this Mr. Orring (phonetic) was starting a

10 company called Saudi-American Lines, had some partners

11 New Orleans and basically got dissatisfied with his amount

12 of the take so he decided to start another company and

13 transfer all of the contracts to that other company.

14 Bordagain, who was a creditor actually, had charter ships,

15 they went for money.  They said, sorry, no assets, there's

16 nothing, has been transferred, so another company is in the

17 business.

18           Upholding the corporate separateness in such

19 circumstances, according to what Judge Schwartz, would mean

20 an absurd result because the wrongdoer gets away with the

21 wrongdoing.  It just leaves the creditors holding the bag.

22 And he did it intentionally, and they did it intentionally

23 in this case.

24           THE COURT:  So --

25           MR. LETOURNEAU:  Your Honor, if I might respond?

1          THE COURT:  Please.

2          MR. LETOURNEAU:  I -- you know, I take these

3    arguments at this stage in the game basically

4    (indiscernible).  We don't respect any of that and yet you

5    have to prove it up.  I'm absolutely convinced we will

6    demonstrate to you by a preponderance of the evidence and

7    beyond that these transactions were all entered at arm's

8    length and (indiscernible), but having said that, we still

9    have to come back to the fact that it is Bergshav Shipping

10   AS and its property that was seized in this case.  And there

11   was no evidence -- and in talking about the cases that

12   Mr. Gaitas addressed, that any of those assets went to

13   Bergshav Shipping AS or that they engaged in any asset

14   stripping, there's just no evidence.  There's neither

15   allegations in the Complaint nor evidence from Mr. Krohn-

16   Hansen today as I asked him that very question.  What assets

17   did (indiscernible), he said it's up to the Court to decide.

18   Well, it's up to the Plaintiffs to put on the evidence.

19   They have to establish a *prima facie* case --

20         THE COURT:  So directly, Mr. Gaitas, sort of

21   respond to that directly.  What evidence or what allegations

22   are there that Bergshav AS was involved in asset stripping?

23         MR. GAITAS:  Your Honor, Bergshav AS is a separate

24   little box in the chart.  It is -- but this link holds

25   together, there are several subgroups, they say so, they are

1    subgroups in a bigger group.  The guiding mind is Mr. Atle

2    Bergshav.  The company that was in charge of this is

3    Bergshav Ship Holding AS.  It owns the unit that have no

4    employees, they have nothing.  They are used as little boxes

5    to compartmentalize the activity.

6            And there is evidence that Bergshav Shipping

7    Limited was involved very heavily in the asset stripping.

8    There is evidence that Bergshav Management AS -- Bergshav

9    Invest I guess was heavily involved.  It started the new

10   corporate entities that took 70 percent of everything from

11   Mr. Bergshav.  And this one was left out.

12           But if you believe them that counts and it is

13   carving out a pocket that cannot be touched.  And this is

14   what my friend is saying, that if it is -- if the wrongdoing

15   is done artfully, it's okay.  And this is what Judge

16   Schwartz rejected and the Fifth Circuit rejected.

17           I lost you, Your Honor.

18           THE COURT:  Mr. Letourneau, I think I interrupted

19   you a moment ago when I asked Mr. Gaitas that question so I

20   apologize.  I think there was some additional things you

21   wanted to add.

22           MR. LETOURNEAU:  Well, Your Honor, there are some

23   other issues I'd like to address and that is I think I

24   addressed the point that I wanted to raise with respect to

25   status.  A variety of cases we're relying upon.  The *Edwards*

1   case, it is 730 F.2d 977 at 981.  That is a case that

2   applies the rationale as why fraud is required in a breach

3   of contract context, fraud is the form of injustice.  That

4   basically laid that foundation for that (indiscernible).

5   Here, again, we believe that there is no evidence of fraud

6   with respect to this Defendant.  This Defendant is the owner

7   of the vessel and there's a dearth of it both in their

8   pleadings as well as in the evidence presented.

9           If we talk about one of their allegations where

10  they reverse veil piercing, if I could draw your attention

11  to a particular bankruptcy case that really gives a great

12  explanation of the history of reverse veil piercing.  And it

13  is called *In Re: Moore*, 379 BR 284, Northern District of

14  Texas, bankruptcy, 2007, basically the discussion I've seen

15  on reverse veil piercing.

16          But the essence of reverse veil piercing is that

17  you have to have an individual obligor who you're going

18  after in order to pierce the corporation veil.  In this

19  particular case, the only individual Defendant who hasn't

20  been served nor has he appeared here, Mr. Atle Bergshav, is

21  not an individual obligor.  The obligors in this case are

22  the B-Gas companies that contracted the bare boat charters

23  with each of the respective owners.

24          So on its face, the reverse veil piercing that

25  they talked about in the briefing simply doesn't apply.  And

1   that's one of the points I wanted to make with you.

2          Another point that I'd like to make with you is

3   that with respect to the argument of single business

4   enterprise, that's another argument that's been raised and

5   briefed in their briefing.  The Federal Courts, the only

6   Fifth Circuit cases that have addressed that issue have

7   relied upon State law.  And the ones relying upon the Texas

8   law precede the Texas Supreme Court's decision and rejection

9   of the single business enterprise doctrine in *SSP Partners*

10  *versus Gladstrong Investments USA Corp.*, and that's found at

11  275 S.W.3d 444, Texas, 2008.

12         And so, you know, in essence what they're relying

13  upon is that single business enterprise theory that has not

14  been adopted by the Fifth Circuit and has been rejected by

15  the Texas Supreme Court.  And so we don't give much credence

16  to that.  There is no Fifth Circuit case law that adopts

17  that doctrine in this context.

18         One other point I'd like to make, too, Your Honor,

19  back to the alter ego issue is that they actually made an

20  admission, Plaintiff made an admission in their opposition

21  brief, Document 21.  This is their opposition to our Motion

22  to Vacate.  But on page 17, and I'll quote it here reads:

23      "Plaintiffs would argue that (indiscernible) reverse

24      veil piercing the applicable terms Bergitta and as

25      whether Bergshav Shipping AS, even though this wholly

1    owned subsidiary of Bergshav Shipping AS was not as

2    (indiscernible) as argued involved in misuse of the

3    corporate forum."

4         And that to me is demonstrative of the fact

5    that there is no alter ego case here effectively

6    giving admission that Bergshav Shipping AS did not

7    introduce (phonetic) the corporate (indiscernible).

8         The last thing I would like to address with you,

9    Your Honor, is information that sets forth in Mr. Hanavich's

10   -- a couple of Declarations that this relates to Bergshav

11   Shipholding and Bepalo.  If you look at the Declaration of

12   Christian Krohn-Hansen, that's Document 15-1, Bergshav

13   Shipholding AS you saw corporate formality is required under

14   Norwegian law.  If you look at the Document 15-2,

15   Declaration of Khan Eiggerton (phonetic) that this company,

16   Bergshav Shipholding, generally meets all the Oxford factors

17   criteria under Fifth Circuit jurisprudence such that there's

18   no way to pierce the corporate veil as between it and

19   Bepalo.

20        And then if you look at the Declaration of Andres

21   Hanavich, that is Document 15-3, this relates to Bepalo and

22   the shareholder agreement that had been in place since 2011.

23   And that shareholder agreement includes protection to the

24   rights of minority shareholders that there's -- that

25   particular company, Bepalo, is -- which was previously B-Gas

1   company that they complain of, 49 percent owned by minority

2   shareholders.  And this particular agreement requires

3   majority for amending the Articles of Incorporation,

4   (INDISCERNIBLE) dividends, sale and purchase of vessels,

5   increased capital share, and entering long-term

6   (indiscernible) charter.

7          And also if you look at page five of Mr.

8   Hanavich's Declaration, you can also see that this company

9   maintains separate corporate formalities in accordance with

10  Fifth Circuit jurisprudence.

11         So our position is, you know, multifaceted.  First

12  of all, we don't believe there was jurisdiction in the first

13  instance.  Second, we don't believe that there were adequate

14  allegations of alter ego status.  There was a failure to

15  plead with particularity with respect to fraud or injustice

16  under Rule 9(b).  We don't believe that the reverse veil

17  piercing applies because we don't have an individual obligor

18  indebted to the Plaintiffs.

19         We don't believe that the single business

20  enterprise doctrine applies because it's been rejected by

21  the Texas Supreme Court, and all of the Fifth Circuit cases

22  that address it in Texas have relied upon Texas law that

23  conveys with the Texas Supreme Court's decision in 2008.

24         And the standards for making corporate formalities

25  for Bergshav Shipholding AS and Bepalo have been met,

1   pursuant to the Declaration that we submitted to the Court.

2   Your Honor, --

3           THE COURT:  Let me ask, I'm actually curious,

4   before I forget two things.  One, when I was talking earlier

5   when we were talking about putting a schedule in place, I

6   think it was Mr. Chalos that mentioned about jurisdictional

7   discovery.  What were you talking about there, what were you

8   focusing on there?

9           MR. CHALOS:  Your Honor, it would be discovery

10  that would be geared towards the relationships and the

11  corporate structures of these entities which would dictate

12  whether the Court has jurisdiction over this dispute.  As

13  alter ego would be a necessary ingredient in our pleadings,

14  the jurisdictional discovery would be geared towards that,

15  to discovering information about the corporate relationships

16  of the parties.

17          THE COURT:  In other words, you're saying

18  discovery to help you show the *prima facie* case.

19          MR. CHALOS:  No, Your Honor.  We contend that

20  we've shown our *prima facie* case, but if the Court is

21  inclined, you know, that they would request additional

22  briefing on this matter, then we would ask for

23  jurisdictional discovery.  But we believe that the pleadings

24  which we have put before the Court, you know, stand on their

25  own two feet.

1        THE COURT:  I'm with you.  If you think -- it's

2   essentially, hey, we think there's a *prima facie* case.  If

3   there's not, what you're really saying is don't get rid of

4   the attachment let us do a little bit of discovery just to

5   try to show you the *prima facie* case.

6        MR. CHALOS:  Yes, Your Honor.

7        THE COURT:  What about the argument that

8   Mr. Letourneau's raised about the verification, right?  So

9   it's clear, I mean, let's call a spade a spade, right?  The

10   verification that's part of the docket entry 1-1 and then

11   the amended claim, docket 17-1, they're not good

12   verifications, it's clear, right?  I mean, all they say is

13   they verify that the statements are true.  I'm sorry, not

14   that the statements are true.  Well, I mean, the language

15   says what it says.  Basically it verifies that he's read the

16   Complaint and that's basically what it says.  I mean,

17   obviously this is an argument that, you know, hasn't been

18   fully briefed, but what's the -- I mean, Mr. Letourneau's

19   position is, hey, the Court therefore lacks jurisdiction at

20   the outset of the case.

21        What say the Plaintiffs?

22        MR. GAITAS:  The Plaintiff, Your Honor, would say

23   that we filed the customary forms that we have used always,

24   and it was brought up at the Rule (E)(4)(f) hearing.

25   Actually it's something that can be cured.  That is

1  something that can be cured if there is a deficiency.  I

2  know sometimes counsel will file a verification if the

3  client is overseas.

4          So this is -- one has to ask -- and I should have

5  asked that.  I thought this was a trivial point.  Mr. Krohn-

6  Hansen had this document, he read them completely, and he

7  verified that they were correct and true.  These are the

8  facts.  And it was I think with its Rule (E)(4)(f) motion,

9  the Defendant should have raised it; then would have been in

10  a position to respond to it.  We're surprised.  Frankly

11  we're surprised by that because we have the burden of proof

12  and we were not told, hey, your verification is defective,

13  if it is defective, we don't concede the point, but --

14          THE COURT:  So what's the answer here,

15  Mr. Letourneau?  Or help me out because, I mean, I do think

16  the verification's defective.  I mean, all it says is I've

17  read -- I guess you can make an argument.  When it says I've

18  read the foregoing Complaint and know the contents and, you

19  know, Mr. Hansen specifically acknowledged in his testimony

20  today that he was not -- did not intend to and was not

21  verifying the truth and accuracy of the statements in the

22  Complaint or the Amended Complaint, is that something that

23  can be cured, is that the showstopper right here and now?

24  What's the legal standpoint?

25          MR. LETOURNEAU:  Your Honor, I believe that it's

1  the standard.  If you like additional briefing on it, we can

2  certainly provide it.  But I believe that the standard is

3  that you look to jurisdiction existing as of the date that

4  the Complaint is filed.  And I would submit to you that

5  absent that verification in the case that it's not properly

6  verified (indiscernible).

7          THE COURT:  I mean, seems to me that's sort of a

8  threshold legal question right up front.  I mean, if you're

9  right and I got to make I guess a determination whether or

10 not the verification is sufficient or not, if it could be

11 amended or, you know, changed, well that -- it's an easy

12 fix, Mr. Gaitas and Mr. Chalos just provide a supplemental

13 verification, you know, that says I've read the foregoing

14 verified Complaint and, you know, attest, you know, to the

15 truth and accuracy -- about the truth and accuracy, or

16 whatever magic language you want to put in, but it really

17 does come down, right, whether it can be remedied or whether

18 as you say jurisdiction attaches and the failure to have a

19 proper verification ends the discussion.

20         So let's do this.  And I'll be very candid.  I'm

21 not sure I know the legal answer to that.  Seems to me

22 that's a legal question, not a factual question.  I think

23 it'd be helpful for me, especially since that's not in any

24 of the briefing, looking through that as you were talking to

25 make sure I hadn't missed something, that I'd like some

1 supplemental briefing on that.  I don't want a ton.  You

2 know, what -- I'm thinking sort of, you know, three to five

3 pages, maybe single-spaced.  I just want, you know, really I

4 guess key is, you know, sort of whatever cases you think --

5           MR. LETOURNEAU:  Understood, Your Honor.

6           THE COURT:  You tell me how much time,

7 Mr. Letourneau, --

8           MR. LETOURNEAU:  Can we have a week from Friday?

9           THE COURT:  A week from Friday?

10           MR. LETOURNEAU:  Yes.

11           THE COURT:  Okay, yes.  And then, Mr. Gaitas and

12 Mr. Chalos, I -- probably the easiest way is to let you

13 respond to whatever he submits.

14           MR. GAITAS:  Well if I am clear, is this the

15 verification of the originally filed Complaint?  Because I

16 don't have it in front of me.  I have everything except

17 that.  I -- may I take a moment to fetch it so I can look at

18 it?

19           THE COURT:  Absolutely

20           MR. GAITAS:  Okay.

21           THE COURT:  And basically as you look for it, the

22 verification on 1-1 and 17-1, there's a minor little

23 difference.  But for all practical purposes they're the

24 same.  I think the thrust of the language is the same.  So I

25 guess it's really two separate questions.  One, is the

1    language sufficient.  I'll just be very up front, my initial

2    thought is no.  But then the second question, probably the

3    more important question up front, which is, you know, is

4    that something that can be -- is that a jurisdictional bar

5    up front or, you know, can it be amended?

6              That's the key question because if it can be

7    amended then you just amend it, there's no issue.

8              MR. GAITAS:  Yes.  May I have a moment to look at

9    it?

10              THE COURT:  Absolutely.

11              MR. GAITAS:  Thank you, Your Honor.

12              THE COURT:  Mr. Hansen, what time is it in Athens,

13   sir?

14              MR. KROHN-HANSEN:  9:30.

15              THE COURT:  Thank you for your patience.  I guess

16   the --

17              MR. KROHN-HANSEN:  My  --

18              THE COURT:  Could be worse, right?  I could have

19   had a -- I could have started the hearing at 4:00 or

20   5:00 o'clock here in America, then --

21              MR. KROHN-HANSEN:  Yeah, no, it's okay, it's fine.

22              THE COURT:  Take the day off tomorrow.

23              MR. KROHN-HANSEN:  Thank you.

24              THE COURT:  Court ordered.

25              MR. GAITAS:  I am missing it, I can't find it

1   right now in this chaos.

2          MR. CHALOS:  I have it up if you want me to share

3   my screen, George.

4          MR. GAITAS:  I can't read that, you know, as you

5   know, I have eyesight problems recently.

6          THE COURT:  No problem.  I'm -- here's what we'll

7   do.  Mr. Letourneau will provide, you know, no more than

8   five pages.  You can do it single-spaced if you want.  But I

9   just -- my question is, is verification sufficient?  And if

10  it's not sufficient, is that a jurisdictional bar?

11         And, you know, to me the key is the cases, I'll do

12  my own research, but always helpful to hear what the parties

13  say.  And then, Mr. Gaitas and Mr. Chalos, if you -- I'll

14  give you a chance to respond, you'll just have your response

15  one week later.

16         MR. GAITAS:  Okay.  Your Honor, could I come back

17  on a couple of points?

18         THE COURT:  Absolutely, absolutely.

19         MR. GAITAS:  The first point I want to address is

20  Mr. Letourneau emphasizes that there is no evidence of B-Gas

21  Shipping AS receiving any proceeds, being involved directly

22  as a party.

23         MR. LETOURNEAU:  No, Your Honor, that's not what I

24  said.  I said Bergshav Shipping AS.

25         MR. GAITAS:  Bergshav Shipping AS; is that right?

1   That's what I said, too.

2           THE COURT:  Okay.  So to make sure I'm clear --

3           MR. GAITAS:  Was not -- could not be an alter ego

4   because it did not receive any of the proceeds of the

5   alleged wrongdoing, it did not participate, it is not pled

6   as having done such things.  And what I would like to bring

7   to the attention of the Court is that this -- he addresses

8   to cover this issue asking justification not from the Fifth

9   Circuit Court of Appeals which addresses a model or it's

10  very (indiscernible) simply, it's a parent and a subsidiary

11  underneath it.

12          Here, we have a much more complex model.  We have

13  a parent company, we have four subsidiaries underneath it,

14  and these companies have an alter ego relationship with each

15  other, which is what we argued in our surreply, and also

16  with the parent company.  There is no Fifth Circuit law on

17  this specific issue, if you can go after the sister company.

18  There is law from lower courts that says that you can, it is

19  possible.  And this is what we have relied on in our

20  surreply and would like an opportunity to show that if this

21  is challenged.

22          Now, but apart from the alter ego, what I would

23  like to emphasize is that we do not entirely rely on alter

24  ego veil piercing in order to get the right to attach the

25  vessel.  We have covered extensively in our briefing, and we

1  can go back to it, that we considered and have argued that

2  the assets seized was property of the parent company.  Its

3  interest in it was its equitable interest because own

4  hundred percent of the shares.  And there is Fifth Circuit

5  law that suggests that such an argument may be tenable.  And

6  that is *Malin International Ship Repair and Drydock v.*

7  *Oceanografia*, 817 F.3d 241.  I think --

8          THE COURT:  Well, that argument is that, what, you

9  would never have to show alter ego to get to the parent in

10  the thing?

11         MR. GAITAS:  Oh, no, the parent company we would

12  concede.  The argument is that the parent has no alter ego

13  relationship -- I mean the Bergshav Shipping AS, the owner

14  of the ship, the daughter company has no participation in

15  the alter ego relationship.  That's what they're arguing.

16         And we're saying it doesn't matter if it does or

17  not because there was -- there is an alter ego situation

18  between the parent company and Bergshav Shipping Limited,

19  the Cypriot (phonetic) company, and it's other subsidiaries,

20  the third subsidiary of the group, Bergshav Invest AS.

21  These were involved in the fraud and wrongdoing, stripping

22  of the assets, creating a new company to take them.  And the

23  parent, they're alter egos of the parent, Bergshav

24  Shipholding AS.

25         And what we're saying, Bergshav Shipholding AS is

1  liable in these circumstances, and it is a hundred percent

2  shareholder of the owner of this vessel that we attached.

3  And we can attach its equitable interest in that vessel.

4  And we have argued that extensive.  And we skipped the alter

5  ego discussions or no alter ego relationship between the

6  registered owner of the vessel, the Bergitta.

7          We have not argued and we don't rely on a Texas

8  single business enterprise.  We think that that theory may

9  be tenable under Federal law and we suggest and have argued

10  extensively.

11          And then, Your Honor, discovery is -- if you have

12  any questions and doubts, I think we made a *prima facie* case

13  and I would endorse what my learned partner says about being

14  allowed to do jurisdictional discovery.  I think we can show

15  that the directors of -- we tried to, we were overruled of

16  B-Gas Limited, our nominee (phonetic).  And nominees, that's

17  not their job, they do that under accommodation, they have

18  no authority, they have no power, they are props.  They are

19  (indiscernible) and they're used for tax purposes and to

20  sign papers.  And we will show that these people did not

21  participate in the decision to sell the ship and they had no

22  idea that the four ships were sold.

23          THE COURT:  Okay.  Thank you.

24          Let me ask you, Mr. Letourneau.  I assume your

25  position is that there is no *prima facie* case shown and that

1  it would not serve any purpose to allow any jurisdictional

2  discovery; is that safe?

3        MR. LETOURNEAU:  Exactly, Your Honor.  You know,

4  our contention is it's their burden.  This is an

5  extraordinary remedy coupled -- prejudgment documents is an

6  extraordinary remedy.  It's coupled with another

7  extraordinary remedy of, you know, alter ego veil piercing

8  done in an ex parte manner to seize a vessel that was

9  basically worth $10 million.  You've got to establish your

10  (glitch in the audio) and we believe that they have not done

11  that either in the pleadings or the evidence that was

12  presented to the Court.  And we should not have to undertake

13  any jurisdictional discovery to satisfy, you know, their

14  efforts to -- in our view to reform their pleadings to make

15  their *prima facie* case when they haven't done it thus far.

16        THE COURT:  Anything else you'd like to add, sort

17  of the final word here?

18        MR. LETOURNEAU:  No, Your Honor.  I think that we

19  have covered everything that I wanted to say.

20        THE COURT:  Mr. Gaitas, Mr. Chalos, anything

21  further?  I do not want anyone to walk away from this

22  hearing say they did not have an opportunity to say

23  everything they wanted to say.

24        MR. GAITAS:  No, I think that, Your Honor, we

25  covered most of it and I think -- and a little bit redundant

1  sometimes.  But, you know, that's what happens when you get

2  lawyers together, so.

3          THE COURT:  I hear you loud and clear.

4          Well, thank you all very much.  I really

5  appreciate the briefing is excellent, the argument, the

6  professionalism.  I got some reading I need to do and then,

7  you know, I'm very curious to see sort of the supplemental

8  briefing you're going to supply.

9          And let me assure you, if you heard me say my

10  initial scheduling conference today, and I'm serious about

11  this is, you know, as a lawyer, I hated judges that sat on

12  things.  And especially my view is Motion to Vacate the

13  attachment in this sense is something, you know, the rule

14  says you get a prompt hearing and there should be a prompt

15  decision.  So I got some work I need to do on reviewing

16  everything, but I will be working hard on that.  And

17  hopefully shortly after I get your supplemental briefing to

18  be able to issue out a ruling and we'll go from there.  So I

19  really appreciate it.  Thank you very much.  Be safe.

20          MR. GAITAS:  Thank you.

21          MR. LETOURNEAU:  (Indiscernible).

22          THE COURT:  Get vaccinated.  Stay health and we'll

23  see you soon.

24      (The parties thank the Court.)

25      (Proceedings adjourned at 1:42 p.m.)

1                              * * * * *

2              I certify that the foregoing is a correct

3    transcript to the best of my ability produced from the

4    electronic sound recording of the ZOOM/telephonic

5    proceedings in the above-entitled matter.

6    /S/ MARY D. HENRY

7    CERTIFIED BY THE AMERICAN ASSOCIATION OF

8    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337

9    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

10   JTT INVOICE #63817

11   DATE:  APRIL 22, 2021

12

13

14

15

16

17

18

19

20

21

22

23

24

25